UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-80090-CR-Hurley/Hopkins

UNITED STATES OF AMERICA,

vs.

**CLIFFORD ERIC LUNDGREN,**

        Defendant,
_____/

**GOVERNMENT'S RESPONSE IN
OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS INDICTMENT OR IN ALTERNATIVE TO SUPRESS EVIDENCE**

**COMES NOW**, the United States of America, by and through the undersigned counsel, hereby files its Response in Opposition to Defendant's Motion to Dismiss Indictment (D.E. # 43). In response thereto the government states as follows:

**I. INTRODUCTION**

The Defendant, CLIFFORD ERIC LUNDGREN, contends that this Court should dismiss the indictment or suppress evidence based on a violation of his due process that resulted from the loss of a government mirror image of codefendant ROBERT J. WOLFF's computer. LUNDGREN's claims are without merit because the lost evidence was not apparently exculpatory before it was lost. Secondly, he fails to sustain a claim that there were no alternative means of demonstrating his

1

innocence. LUNDGREN ignores the important fact that as a party to every email in question he was equally capable of preserving the evidence of the emails. Finally, because the speculative evidence relating to impeachment of WOLFF is merely "potentially useful evidence" LUNDGREN has the burden of demonstrating that S/A David Malone or HSI acted in bad faith. He has not met his burden of proof that the government acted in bad faith.

At the motions hearing, the United States intends to make the following available for cross-examination by Defense or questioning by this Court:

1) S/A David Malone
2) S/A Daniel Richichi
3) S/A Brian Ray
4) CFA Michael Mazzone

## II. STATEMENT OF FACTS

On September 3, 2012, United States Customs and Border Protection (CBP) officers at San Francisco International Airport (SFO) detained a shipment of 2,246 counterfeit Microsoft software CDs which was shipped from China to WOLFF in Boca Raton, Florida. On the same date CBP Officers at SFO detained a shipment of 1,444 counterfeit Microsoft software CDs. The shipment was shipped from China to WOLFF's father in Flushing, New York. A subsequent examination by Microsoft Corporation representatives determined that these CDs were counterfeit.

2

On October 2, 2012, HSI conducted a controlled delivery of the shipment of 1,444 counterfeit Microsoft software CDs to WOLFF's father in Flushing, New York. On October 4, 2012 HSI agents conducted a knock and talk at WOLFF's father's residence. Agents discovered 16 boxes containing 12,764 counterfeit Microsoft software CDs. WOLFF's father stated to agents that the 16 boxes of CDs were his son's, WOLFF. A subsequent examination of a representative sample of the CDs, by Microsoft Corporation representatives determined that these CDs were counterfeit.

On October 2, 2012 HSI agents conducted a knock and talk with WOLFF at his residence located in Boca Raton, Florida. WOLFF stated that he is the owner of a company that is operated out of his residence, and that he sells the Microsoft software CDs to wholesalers throughout the country. WOLFF stated that he would sell the Microsoft CDs for $3.50-$4.00 each, that they were imported from a company in China, and that he would wire money to the company for payment. Furthermore, WOLFF stated that he was not aware that the CDs he was selling were counterfeit.

In October 4, 2012, WOLFF volunteered to be interviewed at the HSI West Palm Beach office. WOLFF identified his supplier as "ERIC LUNGREN" and said that *LUNDGREN*'s business was named "Source Captain." WOLFF provided the email address (EricLungren@sourcecaptain.com) for LUNDGREN.

A.     The Search Warrant/Forensic Examination

On October 24, 2012, HSI West Palm Beach agents executed a search warrant at WOLFF's residence located in Boca Raton, Florida.  A Dell laptop computer and a Samsung laptop computer were seized during the execution of the search warrant. A forensic examination of the Dell laptop computer revealed a series of emails between WOLFF and email addresses associated with LUDGREN regarding the manufacture and distribution of counterfeit Microsoft software CDs.

Agents discovered numerous emails between WOLFF and LUNDGREN conspiring to import and sell counterfeit Microsoft software.  One example is the following email dated June 29, 2011 from Eric Lundgren <ecanetwork@gmail.com> to [WOLFF] <rjw@mindspring.com> which stated: "I have a few thousand pcs waiting for ya in Washington buddy.   We are also working on the SP3 over here… You want some more sp2 made asap? More than the 4,000 that you will currently have? How many did you get pre sold?   How many do you need? Sp2?Sp3?Other?"

Another example is an email dated April 10, 2012 from Eric Lundgren <ecanetwork@gmail.com> to [WOLFF] <rjw@mindspring.com> which stated in part the following: "In 10 days I will receive the mold for SP3 from the northern city of Guanxi and then will have to go back up with your newest sample when it arrives hence another 2 days in travel.. : )   But once we have these two molds made, we will be only ones capable of factory grade production! : )   This will ensure a steady income for the next year to come! : )   I solute you Bob! : ) Good work!"

**B. The Proffer**

On November 16, 2012, a proffer was conducted of WOLFF at the United States Attorney's Office in West Palm Beach, Florida. WOLFF stated that he began doing business in counterfeit Microsoft software CDs with LUNDGREN in approximately 2010 and 2011. WOLFF stated that he knew that the CDs were counterfeit, which contradicted his prior statement. WOLFF stated that LUNDGREN knew that WOLFF was selling the CDs as authentic to his customers.

**C. The Undercover Investigation**

On February 21, 2103, acting at the direction of agents, WOLFF made a consensually monitored phone call to LUNDGREN. WOLFF and LUNDGREN discussed conducting additional business in Microsoft software CDs. LUNDGREN advised WOLFF that he would send him more CDs, however, he would not send WOLFF sleeves and labels for the CDs. LUNDGREN told WOLFF that he could get a label maker and print the labels himself, and that he could use an algorithm computer program to generate serial numbers for the labels.

On February 28, 2013, LUNDGREN sent a text message to WOLFF with an attachment of a U.S. Postal Service receipt for a 56 pound package from the Chatsworth, California post office, which WOLFF forwarded to agents.

On March 4, 2013, WOLFF received an email from an email address associated with LUNDGREN and ITAP (LUNDGREN's company), eric@itassetpartners.com, which stated the following: "Bob, CD's on their way. Flip them quick so I can send

5

you another batch.  Home Depot & NewEgg.com - let me know what you can do.. Thanks, Eric".

On March 6, 2013, United States Postal Inspectors received the package which was shipped from LUNDGREN to WOLFF's home address in Boca Raton, Florida. On March 8, 2013, Postal Inspectors turned over the package to HSI West Palm Beach agents.  Agents searched the package which contained 1,598 Microsoft software CDs.  A subsequent examination of a representative sample of the CDs, by Microsoft Corporation representatives, determined that the CDs were counterfeit.

This package had a hand written label on the exterior which stated that it was shipped from "Eric Lundgren, 9420 Lurline Avenue, Unit F, Chatsworth, CA 91311" (ITAP's business address) and shipped to WOLFF.

On May 7, 2013 agents deposited $3,400.00 in cash into LUNDGREN's Wells Fargo Checking Account.   LUNDGREN had previously provided the account number to the Wells Fargo account via email to an email address that was created by, and under the control of HSI West Palm Beach agents acting in an undercover capacity. At approximately 1:10 pm, WOLFF made a consensually monitored phone call to LUNDGREN at phone number 562-537-7753, which was monitored by agents. WOLFF informed LUNDGREN that payment was made and LUNDGREN stated that the next package of CDs would be on its way to WOLFF.

On May 8, 2013 agents received an email from LUNDGREN with just an attachment of a photograph of a United States Postal Service receipt for a 58 lb.

6

package. The receipt showed that on May 1, 2013 the package was sent from the Winnetka, California post office to Boca Raton, Florida 33433, and was paid for in cash.

**D.      Request to Produce the Government Hard Drive**

On or about September 2016, the United States began preparing the exhibit list for use in the trial of *United States v. LUNDGREN*. In preparation, the undersigned requested that SA Richichi obtain, among other things, the government hard disk drive from the forensic examination containing the image files including the emails. SA Richichi requested that SA Malone provide the government hard disk drive. After a search of the computer forensics room, the entire office, and hard disk drives, conducted by SA Malone and fellow SA Brian Stafford, the government hard disk drive containing the image files could not be found.

**E.      WOLFF Consent to Search Computer**

WOLFF consented to the search of his computer. WOLFF also agreed to authenticate the emails from the first forensic examination. HSI S/A Brian Ray conducted a second forensic examination. The hash value for the mirror image of the computer from the second forensic examination does not match the hash value of the mirror image from the first examination. While not an expert in forensic examination, the undersigned believes that WOLFF's use of the computer subsequent to the first forensic examination caused the hash value to change. Still, the United States believes it can authenticate the emails in this case.

7

### III. MEMORANDUM OF LAW

**A.     Bad Faith Requirement in Lost Evidence Cases**

Because the government lost the computer mirror image, this case is controlled by a line of Supreme Court cases addressing claims concerning the government's failure to preserve evidence, including *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988); and, *Illinois v. Fisher*, 540 U.S. 544, 549 (2004).   *See U .S. v. Dumas*, 207 F.3d 11, 15 (1st Cir.2000) ("[T]he Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. *Brady* and its progeny address exculpatory evidence that is still in the government's possession. *Youngblood* and *Trombetta* govern cases in which the government no longer possesses the disputed evidence." *United States v. Femia*, 9 F.3d 990, 993 (1st Cir.1993)).

The Supreme Court's decisions in *Trombetta* and *Youngblood* govern the constitutionality of the nondisclosure of evidence in "cases in which the government no longer possesses the disputed evidence." *Id.*

In *Trombetta*, defendants were charged with drunk driving and objected to the state's admission of breath-analysis tests. 467 U.S. at 483, 104 S.Ct. 2528. They complained that the police had destroyed the original breath samples and that as a consequence they could not conduct their own tests. *Id.* The Supreme Court rejected the defendants' due process claim. *Id.* at 489, 104 S.Ct. 2528. As a threshold matter,

8

the Court noted that the police "were acting 'in good faith and in accord with their normal practice' " when they disposed of the breath samples. *Id*. at 488, 104 S.Ct. 2528 (*citing Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961)). The Court then held that "more importantly," the missing evidence did not "meet [the] standard of constitutional materiality." *Id*. at 488-89, 104 S.Ct. 2528. To satisfy this standard, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. The Court held that neither condition was met. *Id*. First, the samples were not apparently exculpatory because "the chances [were] extremely low that preserved samples would have been exculpatory." *Id*. The second condition was not met because the defendants had "alternative means of demonstrating their innocence," e.g. inspecting the calibration of the breathalyzer machine or cross-examining the officer who administered the test. *Id*. at 490, 104 S.Ct. 2528.

In *Arizona v. Youngblood*, the Supreme Court considered the police's failure to preserve blood and semen samples taken from a rape victim. A police criminologist had conducted an initial review of the samples, but the state failed to preserve the samples by refrigeration so that the defendant could conduct his own tests. 488 U.S. at 53-54, 109 S.Ct. 333. The *Youngblood* Court found that the evidence was not apparently exculpatory, even though it had potentially greater value than the breath samples in *Trombetta*, because "[t]he possibility that the semen samples could have

9

exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta*." *Id*. at 56 n. *, 109 S.Ct. 333. In explaining *Trombetta's* "apparently exculpatory" requirement, the Court emphasized that it must be apparent that the evidence is exculpatory before it is lost or destroyed. *Id*. at 56, 109 S.Ct. 333. The Court then set forth a new standard for lost evidence that is only "potentially useful." *Id*. at 58, 109 S.Ct. 333. The Court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id*. at 58, 109 S.Ct. 333. In contrast, the Court recognized that a bad faith showing is not required when the evidence is apparently exculpatory: "[t]he Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." *Id*. at 57, 109 S.Ct. 333. The defendant did not establish a due process violation under the facts of *Youngblood* because the evidence was only "potentially useful" and the actions of the police could "at worst be described as negligent." *Id*. at 58, 109 S.Ct. 333.

The issue again arose in *Illinois v. Fisher*, 540 U.S. 544, 549, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004), where the Court reviewed *Youngblood* and *Trombetta.* In *Fisher*, the defendant, who was charged with possession of cocaine, filed a discovery motion requesting all physical evidence, including the cocaine, that the state intended to use at trial. *Id*. at 545, 124 S.Ct. 1200. Before the cocaine was provided to the

defendant, the defendant "jumped bond" becoming a fugitive. *Id*. When he was captured ten years later, the state reinstated the possession charges but had, in good faith, already destroyed the cocaine. *Id* . at 546, 124 S.Ct. 1200. The Court reiterated that "the applicability of the bad-faith requirement in Youngblood depended ... on the distinction between 'materially exculpatory' evidence and 'potentially useful' evidence." *Id*. at 549, 124 S .Ct. 1200. Bad faith was not necessary if the evidence was "materially exculpatory." Because the cocaine was only "potentially useful evidence" there was no due process violation under *Youngblood* because the defendant did not allege that the police acted in bad faith. *Id*. at 547-48, 124 S.Ct. 1200.

When evidence is lost it is usually deemed potentially useful because, as in *Youngblood*, it is hard to prove that the evidence could help exonerate the accused without possessing the evidence in order to test it. In *United States v. Montgomery*, 676 F.Supp.2d. 1218, 1242 (D.Kansas 2009), the court recognized that the majority of courts would find such evidence only potentially useful and thus subject to the *Youngblood* bad faith analysis. In this case, as in *Youngblood*, the evidence merely has the potential to be useful to LUNDGREN if analyzed. Therefore, the analysis focuses on the good or bad faith of the officer or agency. LUNDGREN has not claimed that SA Malone or HSI acted in bad faith.

In *Story v. Martel*, 2011 WL 90112, the Northern District of California refused to imply a finding of bad faith despite the fact that physical evidence was destroyed in contravention of agency policies. While the Northern District "agree[d] that

11

whether destruction of evidence occurred in accordance with established policy may be relevant in determining whether evidence was destroyed in bad faith[,]" it refused to find that this automatically amounted to bad faith because "it is difficult to imagine a negligent loss of evidence that occurs in compliance with department policy, and in *Youngblood* the Supreme Court found that the negligent loss of potentially exculpatory evidence by the police did not violate due process." *Id*. At * 12.   Instead, the court posited that "bad faith in the context of lost or destroyed evidence requires some intent to withhold evidence that may have value to the defense and does not turn on police compliance with evidence destruction policies." *Id*.

LUNDGREN fails to meet the requirements of *Trombetta*, because he cannot demonstrate that the lost evidence possessed an exculpatory value that was apparent before the evidence was lost.  Secondly, LUNDGREN fails to demonstrate that the lost evidence is of such a nature that he would be unable to obtain comparable evidence by other reasonably available means." *Id*.  For example, all of the emails that are the subject of this Motion to Dismiss were between WOLFF and LUNDGREN.  LUNDGREN could have preserved every email in question because they were equally within his custody and control.  The admissibility of the emails is a separate matter.

LUNDGREN's arguments are the same arguments that the dissent voiced in *Youngblood*.  These arguments did not prevail, and the majority declined to require courts to engage in "the treacherous task of divining the import of materials whose

12

contents are unknown and, very often, disputed," or to impose on the police "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id*. at 58. Instead, the Court observed:

> We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Id*.

Defendant has the burden of proving the constitutional violation. See *U.S. v. Revolorio-Ramo*, 468 F.3d 771, 774 (11th Cir.2006) (" 'In order to show that the loss of evidence by the government constitutes a denial of due process, the defendant must show that the evidence was likely to significantly contribute to his defense.... 'To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' ") (citation omitted); *see also Riggs v. Williams*, 87 Fed.Appx. 103, 106 (10th Cir.2004) ("Under *Youngblood*, a defendant can establish a due process violation if he can show that: (1) the government failed to preserve

13

evidence that was 'potentially useful' to the defense; and (2) the government acted in bad faith in failing to preserve the evidence."); *U.S. v. Varner*, 2006 WL 733962, *4 (W.D.Va.2006) ("[T]o prevail under the *Youngblood* test, the [defendants] must prove that the destroyed evidence had apparent exculpatory value, that the officers were aware of the exculpatory nature of the evidence before its' destruction, that the officers acted in bad faith, and that no reasonable comparable evidence exists."); *U.S. v. Solis*, 55 F.Supp.2d 1182, 1189 (D.Kan.1999) ("The defendants do not show that anyone knew the drug evidence had exculpatory value when it was allegedly used or altered.... Regardless whether the government can offer an innocent explanation for evidence being destroyed or altered, the burden of proof on bad faith remains on the defendants."); *Lile v. McKune*, 45 F.Supp.2d 1157, 1163 (D.Kan.1999)("Under *Youngblood*, petitioner has the burden of showing the officers acted in bad faith."); *U.S. v. Lov-It Creamery, Inc.*, 704 F.Supp. 1532, 1548 (E.D.Wis.1989)(The plain language of *Arizona v. Youngblood*, while not using the precise phrase "burden of proof", clearly places that burden on the defendant.... [U]nless a criminal defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process.").

**B.     Impeachment of WOLFF**

At most, LUNDGREN'S claims of prejudice resulting in the lost hard drive are the loss of potentially useful evidence of impeachment of WOLFF at trial.  If it decides to call WOLFF as a witness at trial, the United States would do so for the

limited purpose of authenticating the emails and possibly to testify that he did not alter them. Because WOLFF's testimony is of such a limited nature there is no prejudice to LUNDGREN. Alternatively, the United States can admit the emails without calling WOLFF as a witness.

**C.     Authentication of Emails**

This Court may look to Rule 901 for guidance on the authentication requirements. In *U.S. v. Safavian*, 435 F.Supp2d 36 (D.D.C. 2006), the court found the question under Rule 901 is whether there is sufficient evidence "'to support a finding that the matter in question is what its proponent claims,'" FED.R.EVID. 901(a)-in this case, e-mails between WOLFF and LUNDGREN. *Id.* "The Court need not find that the e-mails are necessarily what the proponent claims, only that there is evidence sufficient for the jury to make such a finding. *See* 5 FEDERAL RULES OF EVIDENCE MANUAL § 901.02[1] at 901-5-901-6 (8th ed.2002); id. at 901-14 ("Evidence is sufficient for authentication purposes if the foundation for particular evidence warrants the trier of fact in finding that it is what the proponent claims."). Rule 901(b) sets forth illustrations of how evidence may be authenticated or identified; []it emphasizes, however, that these are "illustration(s) only" and are not intended to be the only methods by which the Court may determine that the e-mails are what the government says they are. *See United States v. Dean*, 989 F.2d 1205, 1210 n. 7 (D.C.Cir.1993) ( "The rule contains an illustrative, but not exhaustive, list

15

of suggested methods of identification.").1" *Id.*  There is ample evidence for the jury to find that these e-mail exchanges are actual emails between WOLFF and LUNDGREN.

"One method of authentication identified under Rule 901 is to examine the evidence's "distinctive characteristics and the like," including "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." FED.R.EVID. 901(b)(4)."  *Id.*  The United States contends that the emails between WOLFF and LUNDGREN can be authenticated in this manner. "The e-mails in question have many distinctive characteristics, including the actual e-mail addresses containing the "@" symbol, widely known to be part of an e-mail address, and certainly a distinctive mark that identifies the document in question as an e-mail. *See United States v. Siddiqui*, 235 F.3d 1318, 1322 (11th Cir.2000)."  *Id.*  In addition, most of the e-mail addresses themselves contain the name of the person or company connected to the address, such as "ecanetwork@gmail.com, Eric@SourceCaptain.com, eric@itassetpartners.com." Frequently these e-mails contain the name of the sender or recipient in the bodies of the e-mail, in the signature blocks at the end of the e-mail, in the "To:" and "From:" headings, and by signature of the sender. The contents of the e-mails also authenticate them as being from the purported sender and to the purported recipient,

---

1 The first method identified by the Rule is testimony of a witness with knowledge that the matter is what it is claimed to be.  FED.R.EVID. 901(b)(1). As noted above, the government may call the one witness who could authenticate every one of the proffered e-mails, WOLFF.

16

containing as they do discussions of various identifiable matters, such as the shipments of software that are tracked in the CBP system.

Those e-mails that are not clearly identifiable on their own can be authenticated under Rule 901(b)(3), which states that such evidence may be authenticated by comparison by the trier of fact (the jury) with "specimens which have been [otherwise] authenticated"-in this case, those e-mails that already have been independently authenticated under Rule 901(b)(4).

LUNDGREN argues that the trustworthiness of these e-mails cannot be demonstrated because the government hard drive was lost. The Court should reject this argument against authentication of the e-mails. LUNDGREN's argument is more appropriately directed to the weight the jury should give the evidence, not to its authenticity. *See Safavian*, at 40.

**D.   Grand Jury**

LUNDGREN claims that this Court should dismiss the indictment because the government's primary evidence was lost making the testimony to the Grand Jury regarding emails entirely inappropriate. "It is well established that a grand jury is entitled to consider and act upon evidence that would be inadmissible at trial. This general rule, which applies to hearsay, tips, rumors, confessions and other evidence that might be excluded from a trial, naturally embraces probative evidence that may have been unlawfully obtained. The suppression of such probative evidence interferes with the public interest in allowing grand juries considerable latitude in pursuing the

17

truth and helping to bring the guilty to book." *U.S. v. Calandra,* Brief of the United States, 1973 WL 172664 * 6 (1973).

The United States does not concede that LUNDGREN's argument that he is entitled to disclosure of Grand Jury material has merit. However, if the Court is inclined to examine the issue of disclosure of Grand Jury material, the United States requests permission to address the matter in a supplemental proceeding after consultation with and assistance from the United States Attorney's Office.

**E.  Spoliation**

*In United States v. Lanzon*, 2009 WL 1270208 (2009), the district court concluded that, if this Court is to consider law from outside the Eleventh Circuit on this issue, the better approach is to consider the adverse-inference jury instructions given on the spoliation of evidence by courts in criminal cases, which have utilized law similar to that which the Eleventh Circuit has held is proper for such jury instructions in civil cases. *See United States v. Wise*, 221 F.3d 140, 156–57 (5th Cir.2000) (holding that "[a]n adverse inference drawn from the destruction of records is predicated on bad conduct" and, thus, "the district court did not abuse its discretion in declining to give a jury charge on the issue of spoliation" (emphasis added)). There is no allegation of bad conduct that caused the spoliation of evidence in this case.

18

## Conclusion

Wherefore, the government respectfully requests that the defense's motion to dismiss or in the alternative suppress evidence be denied.

>Respectfully submitted,
>
>WIFREDO A. FERRER
>UNITED STATES ATTORNEY
>
> s/LOTHROP MORRIS
>By: LOTHROP MORRIS
>    ASSISTANT U.S. ATTORNEY
>    Florida Bar # 0095044
>    500 Australian Avenue, Suite 400
>    West Palm Beach, FL 33401
>    (561) 820-8711
>    (561) 820-8777 (FAX)
>    LOTHROP.MORRIS@USDOJ.GOV

## Certificate of Service

    I HEREBY CERTIFY that on January 10, 2016, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

                                     S/ LOTHROP MORRIS
                                     LOTHROP MORRIS
                                         ASSISTANT UNITED STATES ATTORNEY